# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

_____

| | |
|---|---|
| In Re | |
| TERREL R. REID and | **Bankruptcy Case** |
| SHARON M. DAVIES, | **No. 10-40057-JDP** |
| **Debtors.** | |

_____

# MEMORANDUM OF DECISION
_____

**Appearances:**

    Thomas J. Angstman, ANGSTMAN JOHNSON, Boise, Idaho, Attorneys for Debtors.

    David F. DeFazio, DEFAZIO LAW OFFICE, LLC, Jackson, Wyoming, Attorneys for Creditor Gardner.

## *Introduction*

Chapter 11[1] debtors Sharon Davies and Terrel Reid ("Debtors") filed

an Objection to Claim No. 2, Docket No. 73, asserted by Lee Gardner

_____

    [1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

MEMORANDUM OF DECISION - 1

("Claimant").  Claimant responded.  Docket No. 86.  An evidentiary

hearing was held on June 30, 2010, after which the Court took the issues

under advisement.  Docket No. 144.  Having now considered the

submissions of the parties, the testimony and evidence presented at the

hearing, the arguments of counsel, as well as the applicable law, what

follows constitutes the Court's findings of fact and conclusions of law, and

decision on the merits.  Fed. R. Bankr. P. 7052; 9014.

### Findings of Fact

Debtors own and operate the business of Davies Reid, Inc., a

subchapter S corporation.  Docket No. 58.  They also owned what has been

described as an "iconic" commercial building on the main square in

Jackson, Wyoming (the "Building"), in which the Davis Reid, Inc. business

was conducted.   At some point, Debtors began to experience financial

difficulties and concluded that they should sell the Building.

In early 2009, Debtors listed the Building through real estate agent

Jeff Ward.  Claimant, who owns several apparel shops in the area, was

interested in purchasing the Building.  On February 10, 2009, he made an

MEMORANDUM OF DECISION - 2

offer to Debtors through his real estate agent, Pete Black, to purchase the
Building for $5,200,000, with a $10,000 earnest money deposit ("Feb. 10
Offer"). Ex. 208. Claimant had visions of utilizing the basement and first
floors of the Building as commercial rental units, and developing the
second floor for sale as condominiums.

After tendering the Feb. 10 Offer, Claimant and Black began to
research the legal and financial implications of Claimant's proposed
purchase of the Building. They inquired with authorities about the zoning
of the Building, learning at some point that Jackson City regulations
restricted residential uses around the main square, effectively frustrating
Claimant's hopes to develop residential condominiums on the second
floor. Predictably, this made the purchase price of the Building less
palatable to Claimant.

Ultimately, the Feb. 10 Offer was rejected by Debtors because the
proposed price was too low, as was the amount of earnest money
Claimant was willing to deposit. Debtors also disfavored the Feb. 10 Offer
because Claimant's proposed "due diligence period," during which other

MEMORANDUM OF DECISION - 3

potential buyers might be disinclined to pursue a purchase of the Building, was too long. Debtors did not want to unnecessarily stifle interest in the Building, which had only been recently listed.

During the spring and early summer of 2009, the Building remained on the market, Debtors' financial condition worsened, and their desire to quickly sell the Building grew, primarily because their mortgage holder had initiated foreclosure proceedings. Debtors were especially interested in securing a cash purchase offer that would close quickly.

Claimant continued to monitor the situation through Black, and eventually on July 24, 2009, made a new purchase offer ("July 24 Offer"). Ex. 3. The July 24 Offer reduced the proposed price to $4,500,000, but increased the earnest money to $25,000. *Id*. Curiously, the July 24 Offer was actually prepared by Debtor's realtor, Jeff Ward, after conversations with Black and Claimant.[2]

After Claimant submitted the July 24 Offer to Debtors, a series of ten

---

[2] Ward's wife performed the "word processing" to prepare the document, but the Court understands Ward specified its contents.

MEMORANDUM OF DECISION - 4

counteroffers followed.  Ex. 2.  In general terms, the purchase price

changed with each counteroffer, and the earnest money deposit amount

changed frequently as well.  Each of the counteroffers was prepared by Jeff

Ward.  *Id.*  The tenth, and final, counteroffer was made by Claimant on

August 19, 2009, and accepted by Debtors on August 20, 2009 (the

"Contract")[3].  *Id.*  The Contract provided that Claimant would buy the

Building for $5,200,000, with an earnest money deposit of $35,000.  *Id.*  It

further provided that Claimant "shall have until September 30, 2009 to

satisfy Contingenc[ies]."  *Id.*  The closing was set for October 9, 2009.

Following execution of the Contract, Claimant and Black continued

to crunch numbers, consider usage ideas, and discuss whether the

numbers would "pencil" in light of the offered purchase price.  As they

neared the September 30 deadline to satisfy contingencies, Claimant

concluded that he could not justify the purchase price he had proposed.

Black prepared a "Letter of Termination" which Claimant signed on

---

[3]  The Contract at issue here represents the terms of the original July 24
Offer as modified by the counteroffers.

MEMORANDUM OF DECISION - 5

September 25, 2009.  Ex. 1.  Prior to sending the termination letter to Debtors, Black had forewarned Ward that Claimant would likely not be able to close the deal, and that a termination letter might be forthcoming.  However, Black held out hope that Claimant could still make the deal work.  Alas, when Claimant ultimately decided to forego the purchase, the termination letter was sent, which Debtor Sharon Davies received on September 28, 2009.  Ex. 205.

Having, in his mind, "terminated" the Contract, Claimant expected to receive a remittance of his $35,000 earnest money deposit from the title company holding the funds.  However, Debtors felt that Claimant had not properly terminated the contract, and as a result, Debtors refused to sign off on the termination letter and thereby release the $35,000 in escrow to Claimant.[4]  Moreover, Debtors demanded that Claimant not only release

---

[4] Claimant filed a state court action against Debtors in Teton County, Wyoming, on December 23, 2009, to recover these funds.  Docket No. 91.  The complaint alleged breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment stemming from Debtors' failure to return the $35,000 earnest money.  Of course, that action was stayed when Debtors filed their bankruptcy petition.  Claimant sought stay relief in order to pursue that action, Docket No. 75, but the Court denied that request, Docket No. 96,

MEMORANDUM OF DECISION - 6

the $35,000 in escrow for their benefit, but also that Claimant pay an

additional $45,000 earnest money deposit.[5] Ex. 205. Thus, the funds

remain in the title company's trust account pending this Court's order.

On January 15, 2010, Debtors filed a joint chapter 11 petition.

Docket No. 1. Claimant timely filed Proof of Claim No. 2 on February 2,

2010, for the $35,000 plus attorney fees. Docket No. 91. On February 25,

2010, the Court approved the sale of the Building for $4,500,000 in cash to

another party. Docket No. 71. The following day, Debtors objected to

Claimant's proof of claim. Docket No. 73.

### *Conclusions of Law and Disposition*

Debtors' objection to Claimant's proof of claim places at issue

whether Claimant has a legal basis to abandon the proposed purchase of

---

exercising its discretion to resolve the issues in this context instead.

[5] Counteroffer No. 3 included a provision for an additional $45,000
earnest money to be deposited within forty-eight hours of the removal of
contingencies. Ex. 2. Each counteroffer included language that provided that
"[a]ll other terms of the attached Contract to Buy and Sell Real Estate and all
prior Counter Offer(s) not modified by this Counter Offer shall remain the
same." *Id.* It is Debtors' position that because Claimant did not specify in the
letter that a contingency was not met, the $45,000 additional earnest money
deposit is due and owing.

MEMORANDUM OF DECISION - 7

the Building, and whether he properly terminated the Contract.  Strictly

speaking, if Claimant properly terminated the Contract, then he would be

entitled to his earnest money deposit back, and the creditor's claim he filed

in Debtors' bankruptcy case should be allowed.  On the other hand, if he is

not entitled to receive a refund of his earnest money, Claimant is not a

proper creditor in Debtors' bankruptcy, and Debtors' objection to the proof

of claim should be sustained.

A.  The Terms of the Contract.

Because the Contract was executed in Wyoming and concerns real

property located in that state, the Court must apply Wyoming law to

resolve the issues.  Wyoming courts have held that:

> [t]his Court construes contractual language as a
> matter of law.  Its goal is to determine the intent
> and understanding of the parties.  It begins the
> inquiry by determining whether the language of
> the contract is clear and unambiguous.  *Reed v.
> Miles Land and Livestock Co.*, 18 P.3d 1161, 1163
> (Wyo. 2001).  If the language is clear and
> unambiguous, the parties' intent is to be secured
> from the four corners of the contract.  *Id*.; *Cliff &
> Co., Ltd. v. Anderson*, 777 P.2d 595, 598 (Wyo.
> 1989).

MEMORANDUM OF DECISION - 8

*Foxley & Co. v. Ellis*, 201 P.3d 425, 429 (Wyo. 2009); *see also Williams v. Collins Commc'ns, Inc.*, 720 P.2d 880, 883 (Wyo. 1986).

Debtors point to no ambiguity in the Contract. Nevertheless, if any ambiguity is present in the Contract, it must be construed against Debtors, whose agent drafted the Contract documents. *See Emulsified Asphalt, Inc. of Wyo. v. Trans. Comm'n of Wyo.*, 970 P.2d 858, 864 (Wyo. 1998) ("Ambiguous contracts are construed against the drafter"); *Idaho Migrant Council, Inc. v. Warila*, 890 P.2d 39, 41 (Wyo. 1995) (citing *McNeiley v. Ayres Jewelry Co.*, 855 P.2d 1242, 1244 (Wyo. 1993)) ("We have repeatedly held that a contract will be construed most strongly against the party who drafted the contract"); *Brazelton v. Jackson Drug Co., Inc.*, 796 P.2d 808, 810 (Wyo. 1990); *Kelliher v. Herman*, 701 P.2d 1157, 1159 n.1 (Wyo. 1985).[6]

As instructed by the cases, then, this Court's charge is to determine, as a matter of law, the intent of the parties as provided by the Contract.

---

[6] Needless to say, for this reason, it is worrisome that Debtors' realtor engaged in drafting Claimant's offers. Regardless of the propriety of this practice, there was no dispute in the evidence that, as a matter of convenience, Ward was the scrivener in this case.

MEMORANDUM OF DECISION - 9

Here, the terms of the Contract are not to be found in any one document.

Instead, the analysis begins with the July 24 Offer, to which additional or

amended terms are added and subtracted as prescribed in the many

counteroffers.

The July 24 Offer had several notable provisions of interest:

- Section III covers the basic purchase terms. It indicates that "$0" of the purchase price will be payable by Claimant by obtaining a new loan, and "$0" will be payable by Claimant's submission of a note and mortgage to Debtors. It further provides that the balance of the purchase price will be paid in "immediately available funds".

- Section IV deals with loan terms. It is completely crossed out via the use of hash marks, as is Section V, which contains loan application provisions.

- Under the closing cost provision in Section VI, the July 24 Offer contains hash marks effectively omitting the requirement that Claimant pay any loan origination fee, credit report, appraisal, inspections, etc., and any other costs of financing.

- Finally, Claimant's right to inspect the Building found in Section XI is also crossed out.

Ex. 3. From these provisions and omissions, it is evident to the Court that

the parties, through the Contract, did not contemplate that Claimant

MEMORANDUM OF DECISION - 10

would purchase the Building through the use of any sort of commercial

financing.  Instead, the parties envisioned that Claimant would pay cash

for the Building.

The July 24 Offer also contained a page entitled "ATTACHMENT

'A' ADDITIONAL PROVISIONS" ("Attachment A").  *Id*.  Paragraph 7 of

Attachment A provides, in relevant part, that "[i]n the event that Buyer

defaults and fails to complete the purchase of the Property without default

of the Seller, Seller's sole remedy shall be to receive 100% of Buyer's

deposit as stipulated as liquidated damages."  Ex. 3.  In addition,

Paragraph 12 of Attachment A provides that "Buyer waives the right to an

inspection".  *Id*.

Finally, the heart of the issues between the parties concerns the

meaning of the following provisions of Paragraph 13:

> This agreement is contingent upon the
> satisfaction of the following contingency (the
> "Contingency"):  title review, development uses
> and restrictions, any and all additional matters
> related to Buyer's due diligence.
>
> Buyer shall have forty-five (45) CALENDAR days

MEMORANDUM OF DECISION - 11

> after acceptance to satisfy the Contingency.  If
> Buyer notifies Seller in writing by 5 PM on or
> before forty-five (45) CALENDAR days following
> acceptance that the Contingency has NOT been
> satisfied, this Contract shall automatically
> terminate and Buyer's earnest money deposit
> shall be refunded to Buyer within forty-eight (48)
> hours following said notification and neither
> party shall have any further obligation
> thereunder.  If Buyer fails to notify Seller in
> writing that the Contingency has NOT been
> satisfied within the time set forth above, the
> Contingency shall be conclusively deemed to
> have been waived and release [sic] by Buyer.

*Id.*

It is this provision that Claimant cites as the legal basis for his claim

that, while he simply walked away from his deal with Debtors, he should

nevertheless recover his earnest money.  Debtors disagree.

B. <u>Due Diligence</u>.

Debtors apparently claim that the "due diligence" contingency

under the Contract consists solely of Claimant's right to perform a title

review, as well as to consult development, use and restrictions.  In other

words, according to Debtors, the "Contingency" as defined in the Contract

MEMORANDUM OF DECISION - 12

encompasses only those two items.

Interestingly, Debtors' realtor, who supervised the drafting of all documents at issue, seems to disagree with Debtors' interpretation of the Contract.  Jeff Ward testified at the hearing that there would be other items outside those specifically listed in Paragraph 13 of Attachment A that would be covered under  Claimant's right to conduct a due diligence review, and that such "general due diligence" is that which is described  in the final clause of the Contract provision, referencing "any and all additional matters related to Buyer's due diligence."  Ex. 3, Attachment A at ¶ 13.

The Court agrees with Ward's reading of that provision.  To parse the provision as Debtors suggest would be to essentially render the final clause of Paragraph 13 superfluous.  Why refer to "additional matters" comprising due diligence if title review and development/use restrictions are the only components intended to be included in Claimant's investigation of the facts?  In addition, Paragraph 5 of Attachment A provides that, *"[a]s a matter of due diligence*, it is recommended that Buyer,

MEMORANDUM OF DECISION - 13

with the help of legal counsel, obtain and review information for mineral ownership and/or water rights which may or may not be appurtenant to the property." Ex. 3, Attachment A at ¶ 5 (emphasis supplied). If due diligence were limited to title review and development/use restrictions as Debtors urge, then Paragraph 5 is also meaningless. This approach to interpreting the agreement would be contrary to the instructions of the Wyoming Supreme Court instructs that a court "must avoid construing a contract so as to render one of its provisions meaningless, since each provision is presumed to have a purpose." *In re Estate of Corpening*, 19 P.3d 514, 517 (Wyo. 2001) (citing *Moncrief v. Louisiana Land & Exploration Co.*, 861 P.2d 516, 524 (Wyo. 1993)).

The Court therefore determines that the Contract does not limit Claimant's due diligence to the items specified in Attachment A, Paragraph 13. Instead, the Court concludes that the Contract clause specifying that "any and all additional matters related to Buyer's due diligence" allows a "Contingency" to include other matters of due diligence in addition to those specifically described.

MEMORANDUM OF DECISION - 14

Because the term "due diligence" is not defined in the Contract itself, the Court will assign it its plain and ordinary meaning. *Caballo Coal Co. v. Fidelity Exploration & Prod. Co.*, 84 P.3d 311, 315 (Wyo. 2004); *State Farm Fire and Cas. Co. v. Paulson*, 756 P.2d 764, 767 (Wyo. 1988). The Wyoming Supreme Court has utilized the definition of due diligence found in Black's Law Dictionary on prior occasions. *See Pittman v. State ex rel. Wyoming Worker's Comp. Div.*, 917 P.2d 614, 617-18 (Wyo. 1996); *Olheiser v. State ex rel. Wyoming Worker's Comp. Div.*, 866 P.2d 768, 773 (Wyo. 1994). That reference defines due diligence as that "reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." BLACK'S LAW DICTIONARY 523 (9th ed. 2009). That definition also references "reasonable diligence" and "common diligence ". Common, or ordinary, diligence is defined as, "[t]he diligence that a person of average prudence would exercise in handling his or her own property like that at issue." *Id*. Finally, reasonable diligence is defined as a "fair degree of diligence expected from someone of ordinary prudence under circumstances like those at issue."

MEMORANDUM OF DECISION - 15

*Id.* Based upon these definitions as applied to the Contract at hand, the

Court can comfortably conclude that Claimant had the right to exercise

that diligence expected from someone of average prudence in considering

the purchase of the Building at issue.

Despite the Contract's broad general due diligence provision, Ward

nevertheless testified that the Court should find that Claimant's right to

exercise due diligence is restricted based upon the circumstances peculiar

to this particular sale.  For example, Ward testified that he informed

realtor Black that Debtors did not want an offer that was contingent on

financing, given their need to quickly close the sale.  He also testified that,

in his view, it made no sense for his clients to entertain an offer that was

contingent on an appraisal of the Building, because Claimant knew that

the Building had been recently appraised at an amount lower than his

offer.[7]

---

[7]  Apparently, Bank of America, the mortgage-holder on the Building, had
commissioned an appraisal in approximately May, 2009, as it contemplated
foreclosure proceedings.  Ward testified that it became common knowledge that
the Bank's appraisal came in around the $4,000,000 range.

MEMORANDUM OF DECISION - 16

Despite Ward's testimony concerning contingencies based upon financing and appraisal, the fact is that the Contract does not reflect any such limitations on Claimant's rights of due diligence.  Moreover, the Court can not appropriately consider extrinsic evidence suggesting terms that are inconsistent with the language of the Contract.  Wyoming case law directs that parol evidence may not be utilized if it is contrary to the terms of the written contract:

> When the provisions are clear and unambiguous, the examination is confined to the "four corners" of the document to construe the intent of the parties.  Extrinsic evidence is not admitted to contradict the plain meaning of an unambiguous contract.  Without a valid reason for variance, the intent of the parties stated in their agreement must be given effect.

*Prudential Preferred Properties v. J and J Ventures, Inc.*, 859 P.2d 1267, 1271 (Wyo. 1993) (internal citations omitted); *see also Sannerud v. Brantz*, 879 P.2d 341, 343 (Wyo. 1994); *North Am. Uranium, Inc. v. Johnston*, 316 P.2d 325, 332-33 (Wyo. 1957).

Admittedly, the Contract denies Claimant an opportunity for an

MEMORANDUM OF DECISION - 17

inspection, and indicates that the amount of the purchase price attributable

by obtaining a new loan is "$0."  Docket No. 3.  However, such references

cannot be read to infer a limitation on Claimant's rights of due diligence,

and the corresponding contingencies upon which he could reconsider

under the Contract.  Therefore, while Claimant's ability to obtain an

appraisal might be limited by the Contract, as well as his ability to finance

the purchase of the Building through a new loan, nothing in the Contract

appears to prohibit Claimant from purchasing the Building through other

types of financing arrangements.  For example, the Contract does not

prohibit Claimant from utilizing a group of investors to fund the purchase.

Hypothetically, if Claimant could not obtain the purchase funds through

investors, nothing in the Contract prohibits him from relying upon the lack

of financing as a contingency.

Furthermore, the Contract does not restrict, and in fact specifically

includes, development uses and restrictions as contingencies which may

be grounds for Contract termination.  While the evidence seems clear that

Claimant understood, prior to making the July 24 Offer, that he could not

MEMORANDUM OF DECISION - 18

convert the second floor of the Building to residential condominiums, both

he and Black testified that they were crunching numbers and exploring

possible scenarios on paper to gauge whether Claimant could justify the

purchase price up until the termination letter was sent.  Indeed, Black

testified that they considered the possibility of adding a roof-top deck, or

perhaps even adding a third story to the Building, to increase its

productive space.  They also considered utilizing a portion of the Building

as a restaurant, and contacted some restauranteurs about becoming the

anchor tenant.  Therefore, although Claimant knew that he could not

utilize the second floor as residential condominiums, he still had to

consider what other development uses were available, and if they were

financially viable options in light of the purchase price.  Claimant and

Black considered lease options, given the current rental market, and

concluded that they could not justify the purchase price.

In addition, Black recommended that Claimant order an appraisal.

The appraisal was completed and the appraised value was informally

conveyed to Claimant, but the formal written appraisal was not completed

MEMORANDUM OF DECISION - 19

before the due diligence period ended.[8]  The appraised value was well

below what Claimant had offered, and he considered this another setback.

In short, Claimant, in exercising the sort of diligence that would be

expected from someone of average prudence when considering the

purchase of the Building, decided he could not justify the price he had

offered to pay.  As a result, he acted appropriately under the Contract in

electing to forego the purchase, and because a "contingency" was therefore

unresolved, Claimant was entitled to a return of his earnest money.

C.  Claimant's Actions to Terminate the Contract.

The Contract was fairly specific about how the contract was to be

terminated for failure of a contingency.  Paragraph 13 of Attachment A

provides, in relevant part,

> If Buyer notifies Seller in writing by 5 PM on or
> before [September 30, 2009, per Counteroffer No.
> 10] that the Contingency has NOT been satisfied,
> this Contract shall automatically terminate and
> Buyer's earnest money deposit shall be refunded
> to Buyer within forty-eight (48) hours following

---

[8]  The appraisal report was not admitted into evidence, and thus the Court
did not consider it.

MEMORANDUM OF DECISION - 20

said notification and neither party shall have any further obligation hereunder.  If Buyer fails to notify Seller in writing that the Contingency has NOT been satisfied within the time set forth above, the Contingency shall be conclusively deemed to have been waived and release [sic] by Buyer.

Ex. 2.

The termination letter sent by Claimant to Debtors provided as follows:

> LETTER OF TERMINATION
> By and between Sharon Davies and Terry Reid (Seller's) [sic] & Lee Gardner (Buyer)
>
> Pursuant to the Terms of the Contract dated July 24, 2009 with respect to the Property located at 15 East Delony Avenue, Jackson WY 83001
>
> Thursday September 24, 2009
>
> This letter shall serve as notification that the contract, by and between the above referenced parties, is hereby terminated in its entirety and is completely null and void.  Per the language in the contract, Buyer's $35,000 of Earnest Money shall be returned in full within 48 hours.
>
> Please see signatures below for confirmation of said termination.

MEMORANDUM OF DECISION - 21

Ex. 1.

Debtors contend that, because Claimant's letter never expressly stated that a contingency had not been met, it was ineffective to terminate the Contract under Paragraph 13 of Attachment A.  The Court disagrees.

While certainly not a model of precision, the termination letter refers to the provision of the contract, Paragraph 13, wherein Claimant is entitled to a return of the earnest money, and very clearly spells out Claimant's intention to terminate the Contract.  The fact that the letter does not explain that Claimant's desire was because a contingency had not been satisfied[9] is not determinative here.  Claimant's letter, while perhaps poorly drafted,[10] was adequate to place Debtors on notice that Claimant was exercising his rights under Paragraph 13.  *See Paradise v. Augustana Hosp. and Health Care Ctr.*, 584 N.E.2d 326, 329 (Ill. App. 1991) ("We note

---

[9]  Of course, the Contract does *not* require Claimant to spell out *which* contingency was lacking.

[10]  This would seem to be another example of why non-legal professionals, this time Claimant's realtor, should exercise extreme caution when attempting to draft, complicated, binding, legal documents for their clients.

MEMORANDUM OF DECISION - 22

that it is not required that adequate written notice specifically contain the word 'termination.' Therefore, the letter constituted sufficient notice because it clearly disclosed to a person of ordinary intelligence that defendant intended to terminate the contract.") (internal citation omitted).

### Conclusion

The Court concludes that Claimant has a proper contractual basis to terminate the Contract, and did so in an effective, timely manner. Thus, according to the Contract's terms, Claimant is entitled to a return of the $35,000 earnest money deposit. Accordingly, when Debtors filed their bankruptcy petition, Debtors owed Claimant $35,000, and was entitled to assert that claim in the bankruptcy case. *See* 11 U.S.C. §§ 501, 502.

Debtors' objection to Claimant's proof of claim will be overruled by

MEMORANDUM OF DECISION - 23

separate order.[11]


Dated:  August 31, 2010

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

--------

[11]  Claimant's proof of claim also asserts a right to recover an unspecified amount of attorney fees.  Docket No. 91.  Debtors has not expressly contested this right.  As a result, Claimant's proof of claim is presumptively valid in this regard.  Rule 3001(f).  *See Renfrow v. Draper*, 232 F.3d 688, 694 (9th Cir. 2000) (a prevailing party in a bankruptcy proceeding may be entitled to attorneys fees while litigating the enforceability of a contract); *Heritage Ford v. Baroff (In re Baroff)*, 105 F.2d 439, 441-42 (9th Cir. 1997); *Am. Express Travel Related Servs. Co. Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1127 (9th Cir. 1996); *In re Haun*, 396 B.R. 522, 527-28 (Bankr. D. Idaho 2008).

MEMORANDUM OF DECISION - 24